FILED

JUL 2 2 2005

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT

AT LEXINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

CRIMINAL ACTION NO. 05-4-KKC

UNITED STATES OF AMERICA,                                                                PLAINTIFF

V.                      **PROPOSED FINDINGS OF FACT
                         AND RECOMMENDATION**

ULYSSES BRANCH, III,                                                                    DEFENDANT

\* \* \* \* \* \* \* \* \* \*

## I. INTRODUCTION

On June 2, 2005, a federal grand jury returned a one-count indictment against defendant Ulysses Branch, III, charging that on or about December 30, 2004, defendant did knowingly and intentionally possess with intent to distribute five grams or more of a mixture or substance containing a detectable amount of cocaine base (crack cocaine), a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).

Defendant was arraigned on this charge, pled not guilty thereto, and this matter is scheduled for a pre-trial conference on July 27, 2005, and a jury trial on August 15, 2005.

On June 24, 2005, defendant moved to suppress all evidence obtained from the search of his vehicle on December 30, 2004, at approximately 2:33 p.m., on the grounds that the anonymous tip, which had been the basis for the police officer being dispatched to the scene was insufficient to establish probable cause to stop and detain defendant or to search his vehicle; therefore, defendant contends that the search of his vehicle violated the Fourth Amendment and that all evidence obtained as a result of that search must be suppressed. [DE #13].

In responding to defendant's motion to suppress, the United States contends that said motion to suppress should be denied. [DE #14].

On July 12, 2005, the undersigned United States Magistrate Judge conducted an evidentiary hearing on defendant's motion to suppress. The United States was represented by Assistant United

States Attorney Hydee Hawkins. Defendant Ulysses Branch, III, was present in person and was represented by David J. Guarnieri. This suppression hearing was transcribed by Rhonda S. Sansom, Official Court Reporter.

At the suppression hearing, the Magistrate Judge heard testimony from Frankfort Police Officer Randy Ray Charles, the arresting officer in this case. This witness was questioned by counsel for the United States, by the defendant's counsel, and by the court.

This matter stands submitted for a report and recommendation to the district court on defendant's motion to suppress.

## II. FACTUAL BACKGROUND

On December 30, 2004, at approximately 2:24 p.m., the dispatcher at the Frankfort Police Department received a telephone call from an anonymous tipster advising that an individual in a dark green Pontiac Bonneville automobile parked in the parking lot at the Wendy's Restaurant located at 184 Versailles Road, Frankfort, KY, bearing Kentucky license plate number 184-LCM had flashed a bag of crack cocaine and that he was calling to report a "suspected drug deal." The dispatcher requested the identity of this anonymous caller; however, the anonymous caller declined to identify himself, stating that he was in law enforcement and did not want to get involved.

Upon receipt of this anonymous tip, the police dispatcher dispatched Officer Randy Ray Charles to the parking lot at the Wendy's Restaurant located at 184 Versailles Road, Frankfort, KY, to investigate this matter. The audiotape of the call from the dispatcher to Officer Charles reflects that the dispatcher simply advised Officer Charles that the suspect in this vehicle had drugs, while providing no details about the drugs. Officer Charles stated that he was dispatched to the scene at 2:25 p.m., arrived on the scene at 2:33 p.m., and observed a green Pontiac Bonneville automobile bearing Kentucky license plate number 184-LCM parked in an angled parking space at the Wendy's Restaurant located at 184 Versailles Road. Officer Charles stated that he pulled in the parking lot and parked his patrol car at an angle several feet behind the defendant's vehicle rather than parking his vehicle in one of the parking spaces adjacent to defendant's vehicle. However, Officer Charles

stated that he did not park directly behind defendant's vehicle so as to block it in the parking space and prevent defendant from leaving the parking space.

After parking his patrol car, Officer Charles exited his vehicle and began walking toward defendant's vehicle. As he approached defendant's vehicle, he testified that he observed defendant, who was sitting in the driver's seat of the vehicle in question, make a leaning down motion toward the floorboard area near the driver's door, reaching with his hands and then raise back up, as if placing something on the floorboard of the vehicle or picking something up from the floorboard of the vehicle.

When Officer Charles arrived at defendant's vehicle, he informed defendant that there had been a drug complaint on his vehicle and asked him if there were any drugs in the car. Defendant responded that there were no drugs in the car. Officer Charles then asked him what he had just done with his hands, asked to see his hands, and requested defendant to place his hands on the steering wheel. Defendant complied with the officer's request by showing Officer Charles his hands, which were empty, and then placed his hands on the steering wheel. In response to Officer Charles's inquiry about what he had just done with his hands, defendant responded that he was getting something out of a Fed Ex box for his son.[1] Officer Charles then asked defendant if this vehicle was his vehicle. Defendant responded that the vehicle was his cousin's vehicle. Officer Charles then stated: "So if there's nothing in here, you wouldn't mind me taking a look?" In response, defendant stated that he had "no problem" with Officer Charles looking in his vehicle.

After defendant verbally consented to Officer Charles looking in his vehicle, Officer Charles requested defendant to exit the vehicle, asked defendant what his name was and requested that defendant produce some form of identification. After defendant exited his vehicle, Officer Charles did not perform a brief pat-down search of defendant's outer clothing for guns or drugs, as would have been permitted by *Terry*. Instead, Officer Charles then escorted defendant to the rear of his

---

[1] An adult female was sitting in the right front seat of defendant's vehicle, and a minor male was sitting in the back seat.

3

vehicle where he was also situated in front of Officer Charles's cruiser, instructed him to stand there, and advised him that he was being videotaped. Defendant complied with Officer Charles's request. Officer Charles then instructed the other police officer who had arrived at the scene to remove the two passengers from defendant's vehicle. Officer Charles then searched defendant's vehicle and found and seized two bags of suspected crack cocaine from the kick panel area on the driver's side of the vehicle, in front of the door area and underneath the dash, lying on the floor area of the vehicle. (TR., Suppression hearing, p. 28). After Officer Charles found the suspected crack cocaine in defendant's vehicle, he returned to the rear of defendant's vehicle, where he had instructed defendant to stand, placed him in handcuffs, performed a pat-down search of defendant, and removed money from defendant's person. Officer Charles then placed defendant under arrest, at 2:37 p.m., four minutes after he arrived on the scene, charging him with trafficking in a controlled substance - first degree.

### III. DEFENDANT'S MOTION TO SUPPRESS

As grounds for defendant's motion to suppress the evidence seized from his vehicle, defendant asserts that the uncorroborated "anonymous tip" to the dispatcher concerning alleged drug activity was insufficient to provide Officer Charles with a reasonable and articulable suspicion that a violation of the law has occurred or is occurring. In support of this argument, defendant relies on *Florida v. J.L.*, 529 U.S. 266 (2000). Defendant also argues that since Officer Charles lacked the requisite "reasonable and articulable suspicion" to make a *Terry*[2] stop, the search of defendant's vehicle was also unlawful and that defendant's verbal consent to search did not make it lawful. For this proposition, defendant relies on *United States v. Chambers*, 395 F.3d 563 (6th Cir. 2005).

In response to the motion to suppress, the United States recognizes that an uncorroborated "anonymous tip" without more is insufficient to justify a *Terry* stop; however, the United States submits that the suspicious movement that Officer Charles observed defendant make with his hands

---

[2] *Terry v. Ohio*, 392 U.S. 1 (1968).

(reaching down to the floorboard of the car on the driver's side of the vehicle as if to place something on the floorboard or to retrieve something from the floorboard) as he approached defendant's vehicle was sufficient to corroborate the anonymous tip and that the anonymous tip, coupled with the officer's observations of defendant's "suspicious movement" with his hands, provided Officer Charles with a reasonable and articulable suspicion that a violation of the law is occurring. Therefore, the United States argues that the present situation is factually distinguishable from *Florida v. J.L.*, *supra*.

As to the search of defendant's vehicle, the United States contends that it was a lawful search based on defendant's voluntary consent, similar to the consent to search that was upheld in *United States v. Erwin*, 155 F.3d 818 (6th Cir. 1998). Based on the totality of the circumstances surrounding the officer's conduct and defendant's verbal consent, the United States asserts that defendant's consent to search his vehicle was voluntary and was not the product of duress or coercion. Therefore, the government argues that the search was a lawful search.

### Applicable Law

The "inquiry into the legitimacy of an investigatory stop involves a two-pronged examination of its reasonableness." United States v. Garza, 10 F.3d 1241, 1245 (6th Cir. 1993). This two-pronged test is (1) "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific articulable facts which gave rise to a reasonable suspicion," and (2) "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." United States v. Hardnett, 804 F.2d 353, 356 (6th Cir. 1986).

"The Fourth Amendment requires that all 'searches and seizures' be based upon probable cause. There are, however, certain 'narrowly drawn exceptions' to the probable cause requirement, including the investigatory detention, or Terry stop." United States v. Garza, 10 F.3d at 1245 (quoting United States v. Sharpe, 470 U.S. 675, 689 (1985)). A Terry stop is lawful if the police

5

officer can point to "specific articulable facts" which formed the basis for a reasonable suspicion that the suspect has been or is about to be involved in criminal activity. Id. at 1245 (relying upon, United States v. Sokolow, 490 U.S. 1, 12 (1989)); Terry v. Ohio, supra. Further, the facts giving rise to the reasonable suspicion by the police officer should not to be considered in isolation, but rather should be "'based upon an assessment of all (emphasis in original) circumstances surrounding the actions of a suspected wrongdoer[,]' including those facts that would arouse suspicion only in someone experienced in law enforcement matters." United States v. Garza, supra, 10 F.3d at 1245 (quoting United States v. Knox, 839 F.2d 285, 290 (6th Cir. 1988), cert. denied, 490 U.S. 1019 (1989).

Additionally, in Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809 (6th Cir. 1999), the Sixth Circuit reiterated that police officers may conduct an investigatory stop if they have a "reasonable suspicion" that a crime has occurred, stating as follows:

> Police may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime. United States v. Palomino, 100 F.3d 446, 449 (6th Cir.1996). The same Fourth Amendment test applies to vehicle stops. See Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); Palomino, 100 F.3d at 449. "Reasonable suspicion" is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person ... of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). It requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); United States v. Erwin, 155 F.3d 818, 822 (6th Cir.1998), cert. denied, --- U.S. ----, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999). The standard outlined in Terry and its progeny is not onerous. The requisite level of suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); McPherson v. Kelsey, 125 F.3d 989, 993 (6th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1370, 140 L.Ed.2d 518 (1998). Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause. Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); McPherson, 125 F.3d at 993.

Houston, 174 F.3d at 813.

### A.  Anonymous tips

Investigatory stops based on an anonymous tip, such as in the present action, pose particular problems for a reviewing court in determining whether a police officer had the requisite "reasonable and articulable suspicion" necessary to justify an investigative *Terry* stop. One of the leading cases

concerning anonymous tips is *Florida v. J.L., supra*, wherein the United States Supreme Court affirmed the Florida Supreme Court in reversing the conviction of a minor charged under state law with carrying a concealed weapon without a license and possessing a firearm while under the age of 18, holding that the anonymous tip in that case, without more, was insufficient to warrant a *Terry* stop of the individual subsequently charged with a criminal offense. In *Florida v. J.L.*, an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. Based only on the information provided by the anonymous tipster, two police officers were dispatched to specified bus stop and observed three black males at the bus stop, one of whom was wearing a plaid shirt. Although the officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements, one of the officers approached J.L., told him to put his hands up on the bus stop, frisked him, and seized a gun from J.L.'s pocket. The other police officer frisked the other two individuals, against whom no allegations had been made, and found nothing.

Subsequently, J.L. was charged with carrying a concealed weapon without a license and possessing a firearm while under the age of 18. He moved to suppress the gun as the fruit of an unlawful search, and the trial court granted the motion. On appeal, the intermediate appellate court reversed, but the Florida Supreme Court reversed that decision, holding that the search of J.L. violated the Fourth Amendment. The United States Supreme Court granted certiorari and affirmed the Florida Supreme Court, explaining, in part, as follows:

> In the instant case, the officers' suspicion that J.L. was carrying a weapon arose not from any observations of their own but solely from a call made from an unknown location by an unknown caller. Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, see *Adams v. Williams*, 407 U.S. 143, 146-147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," *Alabama v. White*, 496 U.S., at 329, 110 S.Ct. 2412. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Id.*, at 327, 110 S.Ct. 2412. The question we here confront is whether the tip pointing to J.L. had those indicia of reliability.
>
> In *White*, the police received an anonymous tip asserting that a woman was carrying cocaine and predicting that she would leave an apartment building at a

specified time, get into a car matching a particular description, and drive to a named motel. *Ibid.* Standing alone, the tip would not have justified a *Terry* stop. 496 U.S., at 329, 110 S.Ct. 2412. Only after police observation showed that the informant had accurately predicted the woman's movements, we explained, did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine. *Id.,* at 332, 110 S.Ct. 2412. Although the Court held that the suspicion in *White* became reasonable after police surveillance, we regarded the case as borderline. Knowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband. We accordingly classified *White* as a "close case." *Ibid.*

The tip in the instant case lacked the moderate indicia of reliability present in *White* and essential to the Court's decision in that case. The anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting J.L. of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L. If *White* was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line.

529 U.S. at 270-71.

Subsequent to *Florida v. J.L., supra,* the United States Court of Appeals for the Sixth Circuit has also had occasion to consider whether police conduct based on an anonymous tip violates the Fourth Amendment, as seen in *United States v. Hudson*, 405 F.3d 425 (6th Cir. 2005). Summarizing the factual background of *Hudson* that is relevant to the present action, the police received an anonymous tip that on September 14, 2001, a woman the police believed to be Hudson's girlfriend, Jamie Potts, who worked at the Pantry Market in Gallatin, Tenn., would arrive to begin her shift at the market at around 3:00 p.m., would be driving a red or maroon Ford Taurus, and would be accompanied by Hudson, for whom an arrest had been outstanding for more than one year for armed robbery of a convenience store. On the basis of the informant's tip, the police investigator's own knowledge, and work done to corroborate the informant's tip, police officers proceeded to the Pantry Market on September 14, 2001, in marked and unmarked police cars. The scene that subsequently unfolded is described in *Hudson*, as follows:

8

> . . . At or around 3:00 p.m., a red or maroon Ford Taurus entered the Pantry's parking lot; Potts was the driver and the passengers were one infant and two black males later identified as Hudson and Charles Burford. Out of a concern for their own safety, the officers approached the car with their firearms drawn in a so-called "felony approach." At the suppression hearing, Hesson described how he and his colleagues had earlier agreed to conduct a "felony approach" because they suspected that Hudson might be armed since he had allegedly used a firearm to commit the robbery. According to Hesson, once the officers reached the car they removed Potts, Hudson, and Burford, then patted the three companions down and, finally, placed them in handcuffs. Only after searching and handcuffing the three did the officers confirm each person's identity.

405 F.3d at 429.

Following Hudson's arrest, he was charged with possession of crack cocaine and with being a felon in possession of a firearm. Hudson entered a conditional guilty plea to these charges, reserving his right to appeal the denial of his motion to suppress the crack cocaine discovered on his person at the time of arrest and a gun found in his residence. On appeal, Hudson argued, in part, that the police officers who stopped the car in which he was a passenger and searched his person lacked reasonable suspicion to support the temporary seizure and pat-down of his person. For this reason, Hudson maintained that the search of his person violated the Fourth Amendment requiring the suppression of the evidence seized from his person. The Sixth Circuit agreed and reversed the district court's denial of Hudson's suppression motion as to the crack cocaine seized from Hudson's person at the time of his arrest, holding that the police officers did not have reasonable suspicion to seize Potts' vehicle and its occupants, including Hudson. The *Hudson* court specifically stated:

> . . . the officers' bare hope of finding a suspect at a particular location does not constitute a particularized and objective basis for seizing, even temporarily, a vehicle and its occupants at that location. As the Supreme Court observed in *Terry*, temporary investigative stops must rest on more than an "inchoate and unparticularized suspicion, [i.e.] a hunch." *Terry*, 392 U.S. at 27, . . .

405 F.3d at 438.

**B.  Reasonable and articulable suspicion**

In evaluating defendant's motion to suppress, it is also necessary to review case law establishing the guideposts for determining when "reasonable and articulable suspicion" is present

9

that would authorize an investigatory *Terry* stop. In considering this issue in *Hudson*, the court stated:

> ... As this Court has observed, "[w]hether there was reasonable suspicion depends on the actual content of the tip [the police] received, not what [the police] subjectively believed the information to be." *United States v. Payne,* 181 F.3d 781, 789 (6th Cir.1999). In all cases, whether officers initiate a seizure pursuant to a tip or pursuant to other leads, "the detaining officers must have a *particularized* and *objective* basis for suspecting the particular person stopped ...." *Cortez,* 449 U.S. at 417-18, 101 S.Ct. 690 (emphases added). The record in this case demonstrates that the officers had no more than a hunch that Hudson would be accompanying Potts to work on the day in question and no more than a hunch that one of the passengers in Potts's car was Hudson. Under the Fourth Amendment, it is clear that this is not enough; instead, for an officer's suspicion to merit description as "reasonable" it must be "grounded in specific and articulable facts, that a person [the officer] encounter[s] was involved in or is wanted in connection with a completed felony." *Hensley,* 469 U.S. at 229, 105 S.Ct. 675. A review of *Hensley* and subsequent cases instructs us that the facts relied upon by the officers in this case were not "specific and articulable," *id.;* nor was the basis for the *Terry* stop of Potts's car "particularized and objective." *Cortez, supra,* at 417-18, 101 S.Ct. 690.
>
> . . .
>
> While it is beyond dispute that police may initiate a *Terry* stop if they "have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony," *id.* at 229, 105 S.Ct. 675, resolution of the question whether reasonable suspicion existed in the first instance must be sensitive to whether the *Terry* stop was made to investigate a crime committed beyond the recent past. *See id.* at 228-29, 105 S.Ct. 675; . . .
>
> . . .
>
> In sum, reasonable suspicion to stop a person, whether suspected of a past or ongoing crime, must rest on specific facts-- available to the officers *before* they initiate contact--tending to show that the person stopped is in fact the person wanted in connection with a criminal investigation. (emphasis in original).

405 F.3d at 434-38.

## Analysis

In considering this matter, the Magistrate Judge must first evaluate the anonymous tip and finds the anonymous tip in this case to be troublesome. Anonymous tips, as opposed to tips from confidential informants who have proved to be reliable in the past, are inherently problematic because there is no way for the court to evaluate the reliability of the informant. In *Hudson*, the Sixth Circuit noted:

10

> Rarely can an anonymous tip by itself constitute a basis for reasonable suspicion, *see Florida v. J.L.,* 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), because "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity ...." *Alabama v. White,* 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Nevertheless, as the Supreme Court observed in *Florida v. J.L.,* "there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.' " 529 U.S. at 270, 120 S.Ct. 1375 (quoting in part *White,* 496 U.S. at 327, 110 S.Ct. 2412). Consequently, where a tip "contains independently verifiable details showing knowledge," *Northrop,* 265 F.3d at 381, that are sufficiently corroborated by the police *prior* to initiating the seizure of the suspect, reasonable suspicion exists. *Id.; White,* 496 U.S. at 326-27, 110 S.Ct. 2412; *J.L.,* 529 U.S. at 270-71, 120 S.Ct. 1375. (emphasis added).

405 F.3d at 432.

The Court in *Florida v. J.L., supra,* also recognized the problem posed by anonymous tips, as seen from the following except from Justice Kennedy's concurring opinion:

> When a police officer testifies that a suspect aroused the officer's suspicion, and so justifies a stop and frisk, the courts can weigh the officer's credibility and admit evidence seized pursuant to the frisk even if no one, aside from the officer and defendant themselves, was present or observed the seizure. An anonymous telephone tip without more is different, however; for even if the officer's testimony about receipt of the tip is found credible, there is a second layer of inquiry respecting the reliability of the informant that cannot be pursued. If the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity. The reviewing court cannot judge the credibility of the informant and the risk of fabrication becomes unacceptable.

529 U.S. at 274-75.

The present action presents a "bare-bones" anonymous tip. The caller stated he was calling to report a "suspected drug deal" and that he observed someone in a dark green Pontiac Bonneville automobile bearing Kentucky license plate number 184-LCM "pull out a bag of cocaine sitting in front of me at Wendy's." However, the caller does not explain how he was in a position to be certain that what he believed to be cocaine truly was cocaine, and he does not explain exactly what he meant by a "suspected drug deal" in that he did not explain that he had just witnessed what he perceived to be a drug deal that had been consummated (i.e., the occupant of this vehicle either had just purchased cocaine from someone else or had just sold cocaine to someone else) or that he believed that a drug deal was about to take place in the parking lot of this Wendy's restaurant. The caller

simply states that the guy was "sitting there in the parking lot and just blatantly pulled it out in front of me."

At the outset, the lack of detailed information in this anonymous tip is troubling. Also troubling is the fact that the informant declined to disclose his identity to the police dispatcher when she asked for his name, stating that "I work in law enforcement myself and I don't want to get involved." It is perplexing to the court that one who is in law enforcement would not want to reveal his identity to other law enforcement personnel in this situation. Arguably, knowing the identity of the informant could lend credibility to an anonymous tip.

The foregoing problems with this anonymous tip are compounded by the fact that this tip lacks any independent corroboration by police prior to initiating the *Terry* stop of the defendant. The government contends that the fact that Officer Charles, as he walked toward the defendant's vehicle upon exiting his cruiser, observed the defendant make what the government characterizes as a "suspicious movement" with his hands, appearing to reach down to the floorboard of the vehicle as though to place something on the floorboard or to retrieve something from the floorboard, is sufficient to corroborate the anonymous tip.

Officer Charles's testimony at the suppression hearing and the videotape of this stop reflects that upon reaching defendant's vehicle, Officer Charles informed defendant that there had been a drug complaint on his vehicle, asked him if there were any drugs in the vehicle, asked him what he had just done with his hands, asked to see the defendant's hands, and requested defendant to place his hands on the steering wheel. Defendant complied with the officer's request by showing Officer Charles his hands, which were empty, and then placed his hands on the steering wheel. In response to Officer Charles's inquiry about what he was doing with his hands, defendant responded that he was getting something out of a Fed Ex box for his son, who was in the back seat of defendant's vehicle. Officer Charles also testified that the Fed Ex box in question was lying on the console in the center of defendant's vehicle, a different location within the vehicle from where Officer Charles stated he observed defendant reach with his hands (the floorboard area of the vehicle to the left of

the driver). The Magistrate Judge infers from Officer Charles's testimony that based on his observation of the defendant's movement with his hands as he approached the vehicle, Officer Charles concluded that defendant did not truthfully respond to his question asking him what he had done with his hands, since the Fed Ex box in question was not lying on the floorboard of the vehicle but was lying on the console in the center of the vehicle, and that defendant's movement with his hands was really an attempt to conceal something. Officer Charles may have jumped to an erroneous conclusion. Officer Charles appeared not to consider the possibility that the Fed Ex box in question could have originally been lying on the floorboard of the car, to the left of the defendant, that defendant could have retrieved something for his son from that Fed Ex box, as he stated he had, and then placed the Fed Ex box on the console in the center of the vehicle, the location where Officer Charles observed it to be when he was questioning the defendant. Consequently, the Magistrate Judge is unpersuaded by the government's argument that the defendant's reaching movement with his hands is a "suspicious movement" that serves to corroborate the informant's tip.

Additionally, irrespective of the information contained in the informant's tip to the dispatcher and irrespective of any independent corroboration thereof, the Magistrate Judge concludes that the legality of the search of defendant's vehicle hinges on the knowledge available to Officer Charles at the time he initiated the *Terry* stop. The audiotape of the dispatcher's call to Officer Charles subsequent to the disptacher's receipt of the anonymous tip reflects that the dispatcher informed Officer Charles that a tipster had reported that there was a green Pontiac Bonneville bearing Kentucky license tag number 184-LCM in the parking lot at Wendy's and that the "subject has 148 and that he is still in the parking lot at this time." Officer Charles testified that "148" means drugs. Thus, in dispatching Officer Charles to the Wendy's parking lot in question, the dispatcher simply gave Officer Charles a description of the vehicle defendant was driving, including the license plate number, and only told him that the defendant had drugs. The dispatcher failed to tell Officer Charles that the informant had reported a "suspected drug deal," that the suspected drug was cocaine, and that the defendant had allegedly flashed a bag of cocaine in front of the informant.

13

Although the information the anonymous caller relayed to the dispatcher concerning the "suspected drug deal" was not given in explicit detail, such as identifying the defendant's race (black, white, Asian, Arabic, Hispanic, etc.), and whether the defendant appeared to be in the process of buying cocaine from another person or whether the defendant appeared to preparing to sell cocaine to a purchaser, along with a description of the others apparently involved in this "suspected drug deal," the failure of the dispatcher to convey even this limited information to Officer Charles resulted in Officer Charles only knowing that a person in a vehicle matching the description of defendant's vehicle and license plate number had drugs. Officer Charles did not know the identity of drugs in question, *e.g.*, it could have been any number of Schedule I or Schedule II controlled substances, such as marijuana, heroin, cocaine, methamphetamine, etc., or any number of prescription drugs being bought or sold illegally. Thus, to reiterate, when Officer Charles arrived at the Wendy's parking lot in question, he only knew the suspect had drugs.

Based on the dearth of information provided to Officer Charles, the Magistrate Judge concludes that Officer Charles did not have a "reasonable and articulable suspicion" that would authorize an investigatory *Terry* stop. As the Court noted in *Florida v. J.L.*, "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." 529 U.S. at 271. In this case, it appears that Officer Charles was provided with insufficient information from the dispatcher to give him a "reasonable and articulable suspicion" that would allow him to lawfully search either defendant's person or his vehicle.[3]

Nevertheless, for the sake of this analysis, the Magistrate Judge will presume *arguendo* that Officer Charles had a "reasonable and articulable suspicion" that would authorize him to briefly detain defendant in a *Terry* stop. Even if it is assumed that Officer Charles had a reasonable and

---

[3] As explained in *United States v. Hudson, supra,* at n.10, 405 F.3d at 439, a police officer is free to approach a suspect and talk with him so long as he does not do so in a manner that would lead a reasonable person to conclude that he was not free to leave. Such consensual encounters need not be supported by any suspicion. However, defendant's encounter with Officer Charles was not consensual and was not based on a reasonable and articulable suspicion.

14

articulable suspicion to warrant a *Terry* stop of the defendant, a complete analysis of the present action also requires the court to consider whether the investigative detention, which may have been authorized, crossed the line during the *Terry* stop and became an unlawful arrest. *United States v. Lopez-Arias*, 344 F.3d 623 (6th Cir. 2003), presents a situation where a lawful investigatory stop became an unlawful arrest. In *Lopez-Arias*, the Sixth Circuit succinctly explained the scope of a *Terry* stop and reiterated the test for determining how an otherwise lawful *Terry* stop can evolve into an unlawful arrest, as set out below:

> Since the Supreme Court decided *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), courts have recognized that a law enforcement officer who lacks probable cause to justify an arrest may nevertheless briefly detain an individual without violating the Fourth Amendment if the officer possesses a reasonable and articulable suspicion that the individual has committed a crime. *United States v. Heath,* 259 F.3d 522, 528 (6th Cir.2001). The scope of this brief investigative detention, however, must be limited to "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Although "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case," in no event may law enforcement officers "seek to verify their suspicions by means that approach the conditions of arrest." *Id.* at 500, 409, 103 S.Ct. 1319.
>
> To determine whether an investigative detention has crossed the line and become an arrest, this court considers factors such as "the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force." *United States v. Richardson,* 949 F.2d 851, 857 (6th Cir.1991). In *Richardson,* this court concluded that law enforcement officers had crossed the line from an investigative detention into an arrest when they placed the defendant in the back of a police car. *Id.* at 857; *see also United States v. Butler,* 223 F.3d 368, 375 (6th Cir.2000) ("We have long recognized that officers cross the line from an investigatory stop into an arrest when they place a suspect in a police vehicle for questioning.").
>
> But there is no bright line that distinguishes an investigative detention from an arrest. *Royer,* 460 U.S. at 506, 103 S.Ct. 1319 (stating that there is no "litmus-paper test" for distinguishing when a seizure exceeds the bounds of an investigative stop). In *Houston v. Clark County Sheriff Deputy John Does 1-5,* 174 F.3d 809, 814-15 (6th Cir.1999), a case relied upon heavily by the government, this court went so far as to decide that an arrest had not occurred when multiple police officers stopped two suspects at gunpoint, handcuffed them, and forcibly placed them into police vehicles. This court found that these protective measures were reasonably necessary because in *Houston* the officers, although lacking probable cause, reasonably believed that the suspects had just shot another police officer. *Id.*

15

344 F.3d at 627-28.

In the present action, after Officer Charles walked up to defendant's vehicle, he informed defendant that there had been a drug complaint on his vehicle and asked him if there were any drugs in the car. Defendant responded that there were no drugs in the car. Officer Charles then asked him what he had just done with his hands, asked to see his hands, and requested defendant to place his hands on the steering wheel. Defendant complied with the officer's request by showing Officer Charles his hands, which were empty, and then placed his hands on the steering wheel. In response to Officer Charles's inquiry about what he had just done with his hands, defendant responded that he was getting something out of a Fed Ex box for his son. Officer Charles then asked defendant if this vehicle was his vehicle. Defendant responded that the vehicle was his cousin's vehicle. Officer Charles then stated: "So if there's nothing in here, you wouldn't mind me taking a look?" In response, defendant stated that he "no problem" with Officer Charles looking in his vehicle.

After defendant verbally consented to Officer Charles looking in his vehicle, Officer Charles requested defendant to exit the vehicle, asked defendant what his name was and requested that defendant produce some form of identification. After defendant exited his vehicle, Officer Charles did not perform a brief pat-down search of defendant's outer clothing for guns or drugs, as would have been permitted by *Terry*. Instead, Officer Charles then escorted defendant to the rear of his vehicle where he was also situated in front of Officer Charles's cruiser, instructed him to stand there, and advised him that he was being videotaped. Defendant complied with Officer Charles's request. Officer Charles then instructed the other police officer who had arrived at the scene to remove the two passengers from defendant's vehicle. Officer Charles then searched defendant's vehicle and found and seized two bags of suspected crack cocaine from the kick panel area on the driver's side of the vehicle, in front of the door area and underneath the dash, lying on the floor area of the vehicle. (TR., Suppression hearing, p. 28). After Officer Charles found the suspected crack cocaine in defendant's vehicle, he returned to the rear of defendant's vehicle, where he had instructed

defendant to stand, placed him in handcuffs, performed a pat-down search of defendant, and removed money from defendant's person.

Although defendant was not formally placed under arrest until after Officer Charles found the suspected cocaine in defendant's vehicle, the Magistrate Judge concludes that Officer Charles's initial *Terry* stop exceeded the scope of that investigatory stop and became an unlawful seizure prior to the search of defendant's vehicle. This conclusion is based on the fact that Officer Charles requested defendant to exit his vehicle, in advance of a search of defendant's vehicle, escorted him to the rear of the vehicle, instructed him to stand there, and informed him that he was being videotaped. At this point, defendant was effectively seized because it is clear from the videotape that defendant was not free to leave the scene. As noted in *United States v. Lopez-Arias, supra*, in determining whether an investigative detention has crossed the line and become an arrest, the court must consider certain factors, such as "significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, . . ." *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir.1991). Based on the fact that defendant was not free to leave the scene after Officer Charles requested him to exit his vehicle, the Magistrate Judge concludes that defendant was unlawfully seized prior to his formal arrest.

## IV. CONCLUSION

In summary, the fatal flaw in this case is that the details of the information contained in the informant's tip to the dispatcher (e.g., information that the informant saw "the guy pull out a bag of cocaine sitting in front of me at Wendy's," etc.) were not conveyed from the dispatcher to Officer Charles. In essence, the dispatcher failed to convey to Officer Charles critical details that might give rise to a "reasonable and articulable suspicion" to perform an investigatory *Terry* stop of defendant.

As explained in detail above, the second problem with this case is that the circumstances with which Officer Charles was presented, including his lack of detailed knowledge about the suspected drugs, did not give him a "reasonable and articulable suspicion" to perform a *Terry* stop.

Finally, even if it assumed *arguendo* that Officer Charles had a "reasonable and articulable" suspicion to perform a *Terry* stop of defendant, Officer Charles crossed the line and unlawfully seized the defendant when he asked defendant to step out of the vehicle, escorted him to the rear of the vehicle, instructed him to stand in that location, and advised him that he was being videotaped, all of which occurred prior to the search of defendant's vehicle.

Accordingly, **IT IS HEREBY RECOMMENDED** that the defendant's motion to suppress the evidence seized from his vehicle on December 30, 2004 [DE #13] be **GRANTED**.

The Clerk of the Court shall forward a copy of this Proposed Findings of Fact and Recommendation to the respective parties. **Due to the fact that this matter is scheduled for a pretrial conference on July 27, 2005, objections to this Report and Recommendation shall be filed on or before Monday, July 25, 2005, with said objections being telefaxed to the opposing party on that same date, and any response to objections filed shall be filed on or before Tuesday, July 26, 2005, with said response being telefaxed to the opposing party on that same date.**

In the absence of any objections filed hereto, a party waives the right to raise the objections in the Court of Appeals. 28 U.S.C. section 636(b)(1)(B); Thomas v. Arn, 728 F.2d 813 (6th Cir. 1984), affirmed, 474 U.S. 140 (1985); Wright v. Holbrook, 794 F.2d 1152, 1154-55 (6th Cir. 1986); Fed.R.Civ.P. 72(b).

This 22th day of July, 2005.

JAMES B. TODD,
UNITED STATES MAGISTRATE JUDGE